# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 18-917V
Filed: June 26, 2019

* * * * * * * * * * * * * *
| | |
|---|---|
| JESSICA SOBCZYK, *on behalf of I.S. a minor* | * UNPUBLISHED |
| Petitioner, | * Decision on Attorneys' Fees and Costs; |
| v. | * Reasonable Basis; Denial |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * |
| Respondent. | * |

* * * * * * * * * * * * * *

*Mark Sadaka, Esq.*, Mark T. Sadaka, LLC, Englewood, NJ, for petitioner.
*Julia Collison, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

**DECISION ON ATTORNEYS' FEES AND COSTS[1]**

**Roth**, Special Master:

On June 26, 2018, Jessica Sobcyzk ("Ms. Sobcyzk" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program[2] on behalf of her minor child, I.S. Petitioner alleged that I.S. received pneumococcal conjugate, rotavirus, diphtheria-tetanus-acellular pertussis ("DTaP"), haemophilus influenzae b ("Hib"), and inactivated poliovirus ("IPV") vaccinations on July 31, 2015, and later suffered from "idiopathic left hemispheric seizures, focal seizure emanating from the left hemisphere, and encephalopathy." Petition ("Pet.")

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

at 1, ECF No. 1. Petitioner alleged that I.S.'s vaccinations either caused or significantly aggravated these conditions. *Id*. On March 18, 2019, I issued a Decision dismissing the petition. ECF No. 18. On May 13, 2019, petitioner filed a Motion for Attorneys' Fees and Costs ("Motion for Fees"). ECF No. 24. Respondent opposed an award of attorneys' fees and costs on the grounds that the petition lacked reasonable basis. *See* ECF No. 25. For the reasons discussed below, petitioner's Motion is hereby **DENIED**.

## I. Background

A.     **Summary of Relevant Medical Records**

I.S. was born on March 25, 2015. Pet. Ex. 5 at 45. On June 4, 2015, I.S. was presented to Medical Center Pediatrics for her two-month well-child check. Pet. Ex. 4 at 5. She received pneumococcal conjugate, rotavirus, DTaP, Hib, and IPV vaccinations without event. *Id*. at 3.

On July 31, 2015, I.S. was presented to Dr. Jacobsen at Through the Years Pediatrics for her four-month well-child check. Pet. Ex. 5 at 21. I.S. was noted to have a red rash on her right armpit and ingrown toenails. *Id*. The rash was assessed as candidiasis and I.S.'s parents were recommended to "apply [an] antifungal cream such as lotrimin" to the affected area. *Id*. at 23. I.S.'s exam was otherwise normal, and she was deemed to be a "well child." *Id*. She received pneumococcal conjugate, rotavirus, DTaP, IPV, and Hib vaccinations. *Id*. at 24.

According to petitioner, in the days after I.S. received her July 31, 2015 vaccinations, she started to cry more frequently "for hours on end." *See* Petitioner's Affidavit, filed as Pet. Ex. 9, at 1-2. I.S. also began making "karate chop" motions with her arms. *Id*. at 2. She would stop making eye contact and would be unresponsive. *Id*.

On Tuesday, August 18, 2015, I.S.'s father telephoned Through the Years Pediatrics and stated that "he thinks child had a seizure an hour ago." Pet. Ex. 5 at 18. He reported that I.S. was "acting weird," staring off into space, did not react when he waived his hand in front of her face, did not focus, was flushed, and was stiff for about 10 seconds. *Id*. He was advised to bring I.S. to the pediatrician. *Id*. I.S. was presented to Dr. Anguiano later that day for "possible seizure." *Id*. at 19. I.S.'s father reported that I.S. had rolled off of the couch on Friday; she cried a little and then was fine. *Id*. She vomited on Saturday; her father stated that she "does that every once and a while" due to acid reflux. *Id*. He reported that I.S. had been fussy that morning and thought it was pain due to teething, so he gave her Tylenol. *Id*. He further reported that I.S. had rhinorrhea, congestion, and rashes on her underarms. *Id*. He did not report "karate chop" motions, excessive crying or colic, or previous periods of unresponsiveness. Upon exam, I.S. was responsive and playful; she was noted to have rhinorrhea, nasal congestion, and erythema. *Id*. at 19-20. The assessment was an "acute episode" of "abnormal tonic activity;" Dr. Anguiano noted that it was unlikely to be related to I.S.'s fall but that should be considered. *Id*. at 20. An EEG was scheduled for the following day. I.S.'s father was instructed to call if he had any concerns or if I.S. was not acting well. *Id*. The rash appeared to be consistent with candidiasis. *Id*. Dr. Anguiano recommended nasal saline and suction for the congestion, and Lotrimin or miconazole for the candidiasis. *Id*.

2

Petitioner telephoned Through the Years Pediatrics four days later, on August 22, 2015; she reported that I.S. "blanks out frequently." Pet. Ex. 5 at 18. Petitioner asked whether she should take I.S. to the emergency room and was "advised to wait for the EEG on Monday." *Id*.

On August 27, 2015, I.S. was presented to Dr. Gross, a pediatric neurologist. He noted that I.S.'s parents were "very good historians" who told him, "Everything was going beautifully until approximately 10 days ago," when they noticed that I.S. was having staring episodes lasting 30 to 40 seconds. Pet. Ex. 3 at 5. They did not report karate chop motions, excessive crying or colic, or previous episodes of unresponsiveness after the July 31, 2015 vaccines. Dr. Gross noted that I.S.'s EEG was "suggestive of focal seizures," and started I.S. on Trileptal. *Id*. at 5-6.

On September 9, 2015, I.S.'s mother telephoned Through the Years Pediatrics to discuss further vaccinations for I.S. The call note stated, "[M]om stated that [at] her last visit, we given (sic) the patient vaccines, and two weeks later, patient developed seizures…" Pet. Ex. 5 at 13. A note from Dr. Jacobson stated, "…at this time [I] would likely recommend [I.S.] receive rotavirus, PCV#13, Hep B #3, and if able IPV and Hib separately and either DtaP or give her Dt." *Id*.

At a follow-up appointment with Dr. Gross on September 17, 2015, I.S. was noted to be "seizure-free ever since starting Trileptal." Pet. Ex. 3 at 4. I.S. received a flu vaccine without event on September 28, 2015. Pet. Ex. 5 at 11. A brain MRI was performed on October 22, 2015 and was unremarkable. Pet. Ex. 3 at 9. I.S. received a second flu vaccine on October 28, 2015, without event. Pet. Ex. 5 at 8. I.S. received Hib, IPV, and pneumococcal conjugate vaccinations on January 6, 2016, without event. Pet Ex. 5 at 4. Her parents were "holding DTaP for now…" *Id*. In the following months, I.S. received additional childhood vaccinations without event. *See* Pet. Ex. 2 at 56; Pet. Ex. 7 at 2-3. At a follow-up appointment on August 1, 2017, Dr. Gross noted that I.S. had "now gone almost two years seizure-free." Pet. Ex. 8 at 1.

### B.     Procedural History

The petition was filed alone on June 26, 2018. ECF No. 1. Petitioner filed medical records and an affidavit on July 11, 2018. Petitioner's Exhibits ("Pet. Ex.") 1-8, ECF No. 7; Affidavit, ECF No. 8. Petitioner filed additional medical records via CD on August 24, 2018, and a Statement of Completion on August 27, 2018. Pet. Ex. 10-20, ECF No. 9; Statement of Completion, ECF No. 10.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on November 6, 2018, recommending against compensation in this matter. ECF No. 12. Respondent stated, "Petitioner's affidavit describes behavioral changes beginning the day after I.S.'s July 2015 vaccinations that…are not substantiated by the medical records." *Id*. at 10. Respondent observed that the medical records reflected an onset of seizures eighteen days after I.S. receiving the allegedly causal vaccinations. *Id*. at 11, n.7. Respondent further submitted there was no "reliable evidence of a *medically appropriate* temporal relationship between I.S.'s vaccinations and the onset of her seizures eighteen days later." *Id*. at 11 (emphasis in original).

I issued an Order on November 9, 2018, with a detailed summary of I.S.'s medical records. Scheduling Order at 1-2, ECF No. 13. I observed that, according to the medical records, "I.S.'s

3

parents consistently placed the onset of her symptoms on or around August 18, 2015." *Id*. at 2. Petitioner was reminded of the presumption of accuracy afforded to contemporaneous medical records. *Id*. Petitioner was ordered to file a status report indicating how she intended to proceed. *Id*. at 3.

Following an extension of time, petitioner filed a status report ("Pet. S.R.") on February 13, 2019. Motion for Extension of Time, ECF No. 14; Non-PDF Order, dated Jan. 15, 2019; Pet. S.R., ECF No. 15. Petitioner requested the opportunity "to file a motion to dismiss the petition." Pet. S.R. at 1.

Petitioner filed a Motion to Dismiss the petition on March 15, 2019. ECF No. 17. On March 18, 2019, the undersigned issued a Decision dismissing the petition for insufficient proof. Decision, ECF No. 18.

On May 13, 2019 petitioner filed a Motion for Attorneys' Fees and Costs. Motion for Fees, ECF No. 24. Petitioner requests attorneys' fees in the amount of $15,018.09 and attorneys' costs in the amount of $495.66 for a total amount of $15,513.75. Motion for Fees, Ex. A, at 9-10. In accordance with General Order #9, petitioner's counsel represents that petitioner did not incur any out-of-pocket expenses. ECF No. 23.

On May 14, 2019 respondent filed a response to petitioner's Motion for Fees. Response, ECF No. 25. Respondent submitted that petitioner did not have a reasonable basis to file this claim.

Petitioner filed a Reply on May 20, 2019. ECF No. 26.

This matter is now ripe for decision.

## II. Legal Framework

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petitioner succeeds on the merits of his or her claim, he or she is entitled to an award of reasonable attorneys' fees and costs. *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). However, a petitioner need not prevail on entitlement to receive a fee award as long as the petition was brought in "good faith" and there was a "reasonable basis" for the claim to proceed. § 15(e)(1).

Good faith is a subjective inquiry that questions whether petitioner's counsel exercised adept professional judgment in determining whether a petitioner may be entitled to compensation. *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014) (citations omitted). In the absence of a showing of bad faith, petitioners in the Vaccine Program are "entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs*., 36 Fed. Cl. 114, 121 (1996).

Reasonable basis is an objective standard determined by evaluating the sufficiency of the medical records in petitioner's possession at the time the claim is filed. However, "a claim may have had a reasonable basis at the time of its filing, [but] reasonableness may later come into question if new evidence becomes available or the lack of supporting evidence becomes apparent."

4

*Chuisano*, 116 Fed. Cl. at 288 (internal citations omitted). Ultimately, reasonable basis considers the "totality of the circumstances" and "looks not at the likelihood of success" but rather "the feasibility of the claim." *Id*. at 286, 288. "Special masters have historically been quite generous in finding reasonable basis for petitions." *Turpin v. Sec'y of Health & Human Servs.*, No. 99-564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005).

The Federal Circuit denied an award of attorney's fees based on petitioner's lack of reasonable basis in *Simmons v. Secretary of Health and Human Services.* 875 F.3d 632, 636 (Fed. Cir. 2017). In *Simmons*, the Federal Circuit determined that petitioner lacked reasonable basis for filing a claim when, at the time of filing: (1) petitioner's counsel failed to file proof of vaccination, (2) there was no evidence of a diagnosis or persistent injury allegedly related to a vaccine in petitioner's medical records, and (3) the petitioner had disappeared for approximately two years prior to the filing of the petition and only resurfaced shortly before the statute of limitations deadline on his claim expired. *See id.* at 634-35. The Federal Circuit specifically stated that the reasonable basis inquiry is objective and unrelated to counsel's conduct prior to filing a claim. The Court consequently affirmed the lower court's holding that petitioner's counsel lacked reasonable basis in filing this claim based on the insufficiency of petitioner's medical records and proof of vaccination at the time the petition was filed. *Id.* at 636.

In light of *Simmons*, the Court of Federal Claims determined, "[I]n deciding reasonable basis[,] the Special Master needs to focus on the requirements for the petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery. . . Under the objective standard articulated in *Simmons*, the Special Master should have limited her review to the claim alleged in the petition to determine if it was feasible based on the materials submitted." *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. 2018). When evaluating a case's reasonable basis, petitioner's "burden [in demonstrating reasonable basis] has been satisfied . . . where a petitioner has submitted a sworn statement, medical records, and [a] VAERS report which show that recovery is feasible." *Id.* Moreover, the special master may consider various objective factors including "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018).

### III. Analysis

Petitioner submitted that her claim maintained reasonable basis throughout the proceeding because a claim of seizure disorder "within days" after receiving pneumococcal, rotavirus, IPV, DTaP, and Hib vaccinations is "feasible." Motion at 4.

Respondent submitted that petitioner's claim never had a reasonable basis and all attorneys' fees should be denied. Response at 5. According to respondent, petitioner's allegation in the Petition that the onset of I.S.'s seizures occurred a "few days" after vaccination was not supported by objective evidence. *Id*. Respondent stated, "…the contemporaneous medical records consistently demonstrate that I.S.'s first symptoms occurred on or about August 18, 2015, eighteen days post-vaccination." *Id*. (internal citations omitted). Respondent submitted that an onset occurring more than two weeks post-vaccination was unreasonable, adding that a "diligent pre-

5

filing investigation of the medical records would have established that this claim was not feasible and should not have been filed." *Id*. at 6.

In her Reply, petitioner elaborated that the petition was "reasonable on its face" because it was "a seizure case with a two-week onset at the most." Reply at 1. Petitioner cited to *McCulloch v. Sec'y of Health & Human Services* as a claim that "was successfully brought by [a] petitioner who argued more than a two-week onset between vaccination and seizure." *Id*.; *McCulloch*, No. 09-293V, 2015 WL 3640610 (Fed. Cl. Spec. Mstr. May 22, 2015). Petitioner also pointed to the affidavit she submitted, in which she described I.S.'s "repetitive motions…similar to the documented seizure activity…" to support an onset of symptoms within two weeks of vaccination. *Id*. at 1-2.

In order to determine whether there was a reasonable basis for this claim, some analysis of the claim itself is required. As a preliminary matter, there was a conflict between the onset of I.S.'s seizures as documented in the medical records and the onset of I.S.'s seizures as represented by petitioner in her affidavit. The medical records filed in this matter indicate that both of I.S.'s parents repeatedly represented to I.S.'s treating physicians at the time of presentation that I.S.'s symptoms began on or around August 18, more than two weeks after I.S. received the allegedly causal vaccinations. Scheduling Order at 2-3, ECF No. 13. On August 18, 2015, when I.S.'s father presented I.S. for examination due to "acting weird" and "staring off into space," he reported that she had vomited the previous Saturday, August 15, had rolled off of the couch the previous Friday, August 14, and was fussy that morning, which he believed was from teething and gave her Tylenol. Pet. Ex. 5 at 18-19. He further reported rhinorrhea, congestion, and rashes under I.S.'s arms. *Id*. at 19. Despite the depth of the details he reported on that date, he did not report "karate chop motions," excessive crying or colic, or prior unresponsiveness in the past 18 days, nor did he mention her vaccinations. *Id*. Though petitioner affirmed after the filing of the Petition that, a few days after receiving the allegedly causal vaccinations, I.S. began making "karate chop" motions with her arms, which, according to petitioner, were indicative of seizures, she never mentioned any of these behaviors to any treating physician. Pet. Ex. 9 at 2.

Contemporaneous medical records are presumed to be accurate and complete. *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Additionally, contemporaneous medical records may be considered more persuasive than a petitioner's affidavit created years after the fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). A review of the billing records reveals that this matter was being investigated over an 18-month period prior to filing. The discrepancy between petitioner's recitation of the events following the vaccinations and those contained in I.S.'s medical records were irreconcilably at odds. Furthermore, the medical records contained no information from which I.S. could meet the criteria for a Table encephalopathy, nor was there any reference to fever, or other behavior to connect a seizure to vaccinations 18 days later.

The Vaccine Injury Table states that encephalopathy occurring within 72 hours of a DTaP vaccination in a child younger than 18 months old is considered a Table injury. *See* 42 C.F.R. § 100.3(a)(II)(B); 42 C.F.R. § 100.3 (c)(2)(i)(A). It is not a Table injury for pneumococcal, IPV,

Hib, or rotavirus vaccines. However, the Table specifies, "Seizures in themselves are not sufficient to constitute a diagnosis of encephalopathy and in the absence of other evidence of an acute encephalopathy[,] seizures shall not be viewed as the first symptom or manifestation of an acute encephalopathy." 4.2. C.F.R. § 100.3(c)(2)(i)(D). To meet the Table criteria for an acute encephalopathy following a seizure, the vaccinee must demonstrate "a significantly decreased level of consciousness that lasts at least 24 hours and cannot be attributed to a postictal state – from a seizure or a medication." 42 C.F.R. § 100.3(c)(2)(i)(A)(2). According to the contemporaneous medical records, I.S. did not have a seizure within 72 hours of receiving the DTaP vaccination, nor did her parents describe a significantly decreased level of consciousness lasting at least 24 hours following vaccination.

Petitioners have prevailed in off-Table claims alleging vaccinations caused seizures where the seizure occurred in conjunction with a post-vaccination fever. *See, e.g., Adams ex rel. Adams v. Sec'y of Health & Human Servs.*, 76 Fed. Cl. 23, 41 (2007) (Infant who developed febrile seizure within 24 hours of receiving a pneumococcal vaccination was entitled to compensation); *Tembenis ex rel. estate of Tembenis v. Sec'y of Health & Human Servs.*, No. 03-2820V, 2010 WL 5164324, at *1, 2, 4, 15 (Fed. Cl. Spec. Mstr. Nov. 29, 2010) (Vaccinee who developed fever and seizures within 12 hours of receiving a DTaP vaccination was entitled to compensation); *Johnson v. Sec'y of Health & Human Servs.*, No. 07-138V, 2010 WL 3291932, at *15 (Fed. Cl. Spec. Mstr. July 30, 2010) (Family was entitled to compensation where infant received DTaP, Hib, hepatitis B, IPV, and pneumococcal vaccinations, had a low-grade fever for two days after vaccination, and seizures four days after vaccination); *Teller v. Sec'y of Health & Human Servs.*, No. 06-804V, 2009 WL 255622, at *2, 5 (Fed. Cl. Spec. Mstr. Jan. 13, 2009) (Vaccinee who developed fever and seizures within 4 hours of receiving DTaP, IPV, hepatitis B, pneumococcal, and Hib vaccinations was entitled to compensation); *Simon v. Sec'y of Health & Human Servs.*, No. 05-941V, 2007 WL 1772062, at *2, 25 (Fed. Cl. Spec. Mstr. June 1, 2007) (Vaccinee who developed fever and seizures within 12 hours of receiving a DTaP vaccination was entitled to compensation). According to the contemporaneous medical records, I.S. did not have a post-vaccination fever, did not have a fever between the date of vaccination and August 18, nor did she have a fever on August 18, 2015 when she was brought to the pediatrician with a complaint of "acting weird," and starting into space, presumably her first seizure.

Encephalopathy, including seizures, occurring within 5 to 15 days of a measles-mumps-rubella ("MMR") vaccination in a child younger than 18 months old is considered a Table injury. *See* 42 C.F.R. § 100.3(a)(III)(B); 42 C.F.R. § 100.3(c)(2)(i)(A). *See also Stapleford v. Sec'y of Health & Human Servs.*, No. 03-234V, 2009 WL 1456441, at *6 (Fed. Cl. Spec. Mstr. May 1, 2009) ("…it is well-recognized that the MMR vaccine sometimes does cause seizures in the second week after vaccination…"). I.S. did not receive an MMR vaccination.

The case law addressing seizures following vaccination is well-established. Petitioners are rarely successful in cases where seizures occur beyond 72 hours for DTaP, or more than 15 days post-MMR vaccination, though there are some exceptions. In her Reply, petitioner cited to one of these exceptions, *McCulloch*, where the petitioner was successful despite a five-week onset period between vaccination and seizure. The vaccinee in *McCulloch* was twelve years old when she received HPV vaccinations on June 8, 2007 and August 16, 2007. *McCulloch*, 2015 WL 3640610 at *3. She developed symptoms five weeks later, including fever and seizures, and was later

7

diagnosed with intractable epilepsy, encephalitis, and status epilepticus. *Id*. at *3, *8. Petitioner alleged that A.M. developed autoimmune limbic encephalitis ("ALE") due to the HPV vaccine and proffered a theory of molecular mimicry between components of the HPV vaccine and aquaporin-4 water channels in the brain. *Id*. at *8, *23. The special master found petitioner's theory persuasive and agreed that a period of five weeks between vaccination and onset of symptoms was medically appropriate for the theory of molecular mimicry. *Id*. at *28, 32.

The instant claim is not analogous to *McCulloch*. The vaccinee in *McCulloch* received HPV vaccinations and had a severe clinical course. I.S. received pneumococcal conjugate, rotavirus, DTaP, IPV, and Hib vaccinations, was apparently fine until 18 days later, and was then deemed consistently "seizure free" after starting Trileptal. Moreover, unlike the vaccinee in *McCulloch*, I.S. was never diagnosed with intractable epilepsy, encephalitis, status epilepticus, or autoimmune limbic encephalitis. The five-week onset period following HPV vaccination in *McCulloch* does little to aid in the eighteen-day onset in this matter and is significantly different with respect to the facts and seizure onset following pneumococcal conjugate, rotavirus, DTaP, IPV, and Hib vaccinations in this case.

As stated above, as the billing records reflect, an extensive pre-filing inquiry was performed and the inconsistency between the medical records and the facts as stated by petitioner, was apparent, making petitioner's claim not feasible due to the eighteen-day gap between I.S.'s receipt of the allegedly causal vaccinations and her first seizure.

There is no corroborative evidence in the record to support a causal relationship between I.S.'s vaccinations and her first afebrile seizure 18 days later.

Based on the foregoing, petitioner's Motion for Attorneys' Fees and Costs is hereby **DENIED**. The Clerk of the Court is directed to enter judgment in accordance with this Decision.

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master
